1

2

3

4

5

6               IN THE UNITED STATES DISTRICT COURT

7                  FOR THE DISTRICT OF ARIZONA

8

9   Eltorna Gant,                    )    No. CV-10-676-PHX-JWS (LOA)
                                      )
10              Petitioner,           )    **REPORT AND RECOMMENDATION**
                                      )
11  vs.                               )
                                      )
12  Charles Ryan, et al.,             )
                                      )
13              Respondents.          )
                                      )
14  _____ )

15          This matter arises on Petitioner's Petition for Writ of Habeas Corpus.  (Doc. 1)

16  Respondents have filed an Answer, doc. 12, to which Petitioner has replied, docs. 21, 25.

17  For the reasons set forth below, the Petition should be denied.

18  **I.  Factual and Procedural Background**

19          **A.  Factual Background**

20          The following events gave rise to Petitioner's challenged convictions and

21  sentences.  Petitioner and Betty W. were in a long-term relationship and had three sons.

22  (Respondents' Exh. A at 8; Exh. B at 53[1])  Betty and two of her sons, J. and T.J., lived at the

23  Family Estates Apartments, apartment # 14, in Eloy, Arizona.  (Respondents' Exh. A at 7-8,

24  _____

25          [1]  Citations to "Respondents' Exh. __" are to Exhibits to Respondents' Answer to
26  Petition for Writ of Habeas Corpus.  (Doc. 12, 13)  Respondents' Exhibits include the: Exhibit
    A - transcript April 3, 2002; Exhibit B - transcript April 4, 2002; Exhibit C, transcript April 2,
27  2002; Exh. D, transcript April 9, 2002; Exh. E, transcript April 21, 2002.  In their Answer,
    Respondents often mistakenly cite Exh. C, when referring to portions of the April 2, 2002
28  transcript which appears at Exh. A.  (see doc. 12)

Exh. C at 140-41)   Betty's mother, Janice, lived in apartment # 11 at the same complex.

(Respondents' Exh. A at 7-8; Exh. C at 143)   Petitioner was also involved with another

woman with whom he had three sons in Mesa, Arizona.  (Respondents' Exh. B at 81)

Petitioner had previously told Betty, "if he ever go[es] off, he's going to kill [her] whole

family."  (Respondents' Exh. A at 30)   Petitioner did not like Betty's sister, Barbara, who

worked at the DES office in Eloy.  (Respondents' Exh. A at 9, 29-30)

At around 6:00 a.m. on October 12, 2000, T.R., a friend of T.J.'s came to Betty's

apartment and the two went onto the balcony.[2]  (Respondents' Exh. C at 175-76, 178-79)

T.R. lived nearby and was close to Betty, her sons, and Janice.  (Respondents' Exh. C at

175, 183; Exh. A at 15)   T.R. was a known gang member, drug user, and was frequently

armed. (Respondents' Exh. A at 104-05)  At around 8:45 that morning, Petitioner appeared

at Betty's apartment.  Petitioner told T.R. "this is not a hang out spot."  (Respondents' Exh.

C at 179; Exh. A at 8-9, 11, 39)   T.J. told T.R. that he could stay at the apartment because

Petitioner didn't live there and was not in charge.  (Respondents' Exh. C at 179)   T.R.

stayed.  Petitioner left the apartment, but stayed in the apartment complex. (*Id.*)

At around 9:00 a.m., Betty returned to the apartment from the grocery store.

Petitioner and Betty argued about the apartment being "dirty" and about drug use in the

presence of Petitioner's youngest son.  (Respondents' Exh. A at 11, 39-40; Exh. B at 57-58)

Betty told Petitioner, "don't tell me what to do," stating that Petitioner didn't live in the

apartment, was not her "man," and couldn't "tell [her] what to do."  (Respondents' Exh. A at

11)   Betty told Petitioner it was her home and "if it's going to be dirty, it can be dirty."

(Respondents' Exh. A at 11-12)   Petitioner told Betty that, when he returned, "the house

better be clean or else," and left.  (Respondents' Exh. A at 12)

Petitioner drove to Coolidge, Arizona, and borrowed a Beretta 9mm handgun

from his friend, John C.  (Respondents' Exh. C at 64-67)   Petitioner told John he wanted the

---

[2]  Petitioner's and Betty's oldest son, Eltorna Gant, Jr., is also referred to as T.J.
(Respondents' Exh. B at 53)

gun because, "he was going to Tucson and he had some business to take care of and he really didn't trust the vehicle that he was in, because it was a little on the raggedy side." (Respondents' Exh. C at 68)   Although the gun was "virtually brand new," it tended to "jam" if John fired "Black Talon" bullets, or if he engaged in "rapid firing."  (Respondents' Exh. C at 70)   Before giving Petitioner the gun, John removed four Black Talon rounds from the magazine, leaving nine rounds in the magazine.  (*Id*. at 76-77)   Petitioner testified that he obtained the gun for self-defense because he was afraid of T.R. who was known to carry a weapon and had threatened him in the recent past. (Respondents' Exh. B at 54-56,61)

In the meantime, Betty, T.J., and T.R. left Betty's apartment and went outside of Janice's apartment, # 11.  (Respondents' Exh. C at 182)   T.R. left for a few minutes to buy marijuana, and when he returned, he and T.J. sat at a picnic table outside a laundry room near Janice's apartment.  (*Id*. at 150,189)   While T.J. and J.R. were sitting at the picnic table, Petitioner drove up and called out for his 2½-year-old son, J.  (*Id*. at 146, 189; Exh. B at 88-89)   J. got into Petitioner's car, and Petitioner drove away.  (Respondents' Exh. C at 146, 189-90)   Betty was standing outside Janice's apartment talking on the phone. (Respondents' Exh. C at 144, 146-47)   Betty's cousin, Gladys, was sitting outside Janice's apartment drinking coffee.  (Respondents' Exh. A at 10; Exh. C at 144, 147)

Shortly thereafter, Petitioner returned, put the gun in the waistband of his pants, and approached Betty, who was still standing outside Janice's apartment talking on the phone.  (Respondents' Exh. A at 12; Exh. B at 89; Exh. C at 147-48, 190-91)   Petitioner asked Betty "where her mom" was, and told her, "the stuff you all [were] laughing about this morning wasn't that funny."  (Respondents' Exh. A at 12-13; Exh. C at 148)   Betty did not respond.  (Respondents' Exh. A at 13)   Petitioner walked toward the laundry room , then said, "oh, is it going to be like that, boo?"  (*Id*.; Respondents' Exh. C at 191)   Betty dismissively waved her hand.  (Respondents' Exh. A at 13)   Petitioner kept walking toward the laundry room and picnic table where T.J. and T.R. were sitting.  (Respondents' Exh. A at 13, 97; Exh. C at 148, 151, 191)

1    Before reaching the picnic table, Petitioner pulled out the gun, and "started firing

2   at [T.R. and T.J.]," (Respondents' Exh. A at 14-15)    Petitioner and his son, T.J., testified

3   that T.R. had approached Petitioner and was within striking distance of him when Petitioner

4   fired the gun.  (Respondents' Exh. B at 13-14, 27-29, 50, 62)  T.R. and T.J. ducked under

5   the picnic table and tried "to dodge the bullets" as Petitioner walked toward them and fired

6   the gun.  (Respondents' Exh. C at 193-94)   T.R. decided to run because Petitioner was

7   "getting too close."  (Respondents' Exh. C at 195)   When T.R. tried to run, Petitioner shot

8   him through the jaw, shoulder and throat.  (Respondents' Exh. C at 196-97)   T.R. kept

9   running toward Santa Cruz High School and heard Petitioner "shooting the gun."  (*Id.* at

10  197-98)

11    When Petitioner started shooting, Gladys ran around the corner of the building

12  into her apartment.  (*Id.* at 153-54)   A short while later, Petitioner ran up to her apartment

13  and asked Gladys' husband, Travis, if T.R. had entered the apartment.  (Respondents' Exh.

14  C at 154, 159-60; Exh. A at 27)   Travis told Petitioner no and told him to go away.

15  (Respondents' Exh. C at 154)

16    Betty ran into Janice's apartment and tried to call 911 on the cordless phone.

17  (Respondents' Exh. A at 16-17)   Janice was in the living room.  (*Id.*)  Betty eventually got

18  through to the 911 operator.  (Respondents' Exh. A at 18-19)    Petitioner opened the door to

19  Janice's apartment and Betty ran towards the kitchen.  (*Id.* at 19)   Petitioner shot Betty in

20  the lower back, and she fell over a chair onto the kitchen floor.  (*Id.* at 19-20, 23, 55-56)   A

21  second bullet "went right by [Betty's] head" and into a kitchen cabinet.  (*Id.* at 23-24)

22  Petitioner then shot Janice in the stomach.  (*Id.* at 23, 213-15)   Betty "raised up" and saw

23  Petitioner leave the apartment.  (Respondents' Exh. A at 26)   Janice asked Betty if she was

24  "okay."  Betty responded that she'd been shot.  (*Id.*)

25    Gladys looked out her apartment and saw Petitioner walking towards his car.

26  (Respondents' Exh. C at 155)   One of Petitioner's sons, "Little Gant," was "running behind

27  him telling him daddy, no, no daddy, stop."  (*Id.*)   When Gladys and Travis were sure

28  Petitioner was gone, they headed to Janice's apartment.   (Respondents' Exh. C at 155)

Betty told Janice to stay in the apartment and she would try to get help.  (Respondents' Exh. A at 26)   Betty then left the apartment, headed to Gladys' apartment, and ran into Gladys and Travis on the way.  (Respondents' Exh. A at 27-28; Exh. C at 155)   Betty told Gladys that Petitioner had shot her.   The three returned to Janice's apartment where they found Janice "slouched over in the couch." (*Id*. at 156; Exh. A at 28)   Initially, they thought Janice had had a heart attack, not realizing she had been shot.  (Respondents' Exh. A at 28; Exh. C at 157)   They unsuccessfully tried to resuscitate Janice.  (Respondents' Exh. C at 157)

Meanwhile, as T.R. approached a building near Santa Cruz High School, he heard more shots.  (Respondents' Exh. C at 198-99)   T.R., who was bleeding "profusely," ran towards the Eloy Police Station.  On his way, he saw T.J., who encouraged him to keep going and accompanied T.R. to the police station.  (Respondents' Exh. C at 81, 199-200)

Around 11:20 a.m., Captain Barry Pritchett of the Eloy Police Department, who was not in uniform, was standing on the sidewalk outside the police station talking to the public works director, when T.J. came running around from the north end of the police station exclaiming, "Detective, detective my dad just shot my mom, my dad just shot my mom." (Respondents' Exh. A at 80-81)   Captain Pritchett asked, "Where?"  Petitioner replied, "at Family Estates." (Respondents' Exh. A at 81)   As Captain Pritchett and T.J. proceeded to the building's entrance, T.R. appeared "covered in blood," and "bleeding profusely from a neck wound." (Respondents' Exh. A at 82)    T.R. told Captain Pritchett he had been shot by "Eltorna Gant, Sr." (*Id*.)   After Captain Pritchett tried to administer first aid to T.R., who was getting weak and thought he was going to pass out, T.R. was air-evaced to the hospital.  (Respondents' Exh. A at 83-85; Exh. C at 203)

In the meantime, Sergeant Shane Blakeman had T.J. get in his car and started driving towards the Family Estates apartments.  One the way, T.J. pointed to a small brown car on 8th Street and said it was his dad's car.  (Respondents' Exh. A at 88)   Sergeant Blakeman told T.J. to get out of the car and go home, and then "paralleled" Petitioner on 7th Street.  (*Id*. at 89)   Petitioner turned south on E Street and Sergeant Blakeman turned behind

1  him.  Petitioner turned east on 5th, south on Sunshine, then into the Eloy DES parking lot.

2  (Respondents' Exh. A at 89)   Petitioner made a U-turn in the parking lot, then drove to the

3  front entrance of the Department of Economic Security ("DES") office and stopped.  (*Id*.)

4  Sergeant Blakeman requested assistance, then stopped his car, got out with his weapon

5  drawn, and ordered Petitioner, who had exited his car, to "go down to the ground."

6  (Respondents' Exh. A at 90)   Petitioner did not comply.  Sergeant Blakeman continued

7  ordering Petitioner to get on the ground, and Petitioner repeatedly responded, "what?"

8  (Respondents' Exh. A at 90)   Within seconds, another officer arrived, and both ordered

9  Petitioner to put his hands up and get down on the ground. (Respondents' Exh.  A at 90-91)

10  Petitioner put up his left hand, then threw a handgun in nearby bushes.   Petitioner then

11  removed his jacket, got on the ground, and told Sergeant Blakeman to handcuff him.

12  (Respondents' Exh. A at 91)   Sergeant Blakeman handcuffed Petitioner, and then retrieved

13  the 9mm Beretta handgun from the bushes.  (*Id.* at 91-92)   The magazine was empty, but

14  there was "one loaded round in the chamber."  (*Id*.)   Petitioner was taken to the Eloy Police

15  Department.  (Respondents' Exh. A at 94, 186-87)   Sergeants Blakeman and Nolasco drove

16  to the Family Estates apartment complex and were the first officers on the scene.  (*Id*. at 94)

17        Sergeants Blakeman and Nolasco saw a crowd of people in and around apartment

18  # 11.  (Respondents' Exh. A at 94-95)   Betty was bent over a chair with her knees and feet

19  on the floor, and Janice was unconscious on the couch.  (Respondents' Exh. A at 95-96)

20  Betty told Sergeant Blakeman that when Petitioner started shooting, he announced, "You

21  know you don't want me here.  I'll kill your whole family."  (*Id*. at 97)   She told Sergeant

22  Blakeman he had to "get to DES right now," because she was afraid Petitioner was going to

23  kill her sister who worked at DES.  (*Id*.)

24        At 12:35 p.m., Eloy Police Officer Cable Johnson was assigned a "safety and

25  welfare" watch over Petitioner.  (Respondents' Exh. A at 186-87, 194, 196, 203)   Officer

26  Johnson and Detention Officer Ratliff sat outside Petitioner's cell.  (*Id*. at 186-87, 195)

27  Petitioner started speaking to Officer Johnson who told Petitioner he "wasn't there to answer

28  any questions or ask any questions."  (*Id*. at 187)   Petitioner told Officer Johnson that he

"was a former police officer and he knew what his *Miranda* warnings were" and that he "knew anything he said could be - would and could be held against him in a court of law." (*Id*. at 188)   Officer Johnson reiterated that he "wasn't there to ask him any questions." (*Id*.) Petitioner stated that he "understood that," and "continued to speak," so Officer Johnson "took notes on what he was saying." (*Id*. at 187-88)

At 1:00 p.m., Petitioner stated that he "should have drawn down on [the officers who arrested him], so that way they could have got it over with then and it wouldn't take so long to get what he's got coming to him." (Respondents' Exh. A at 189)   At 1:40 p.m., Petitioner shouted that he "knew what he had done," that he had "shot people." (Respondents' Exh. A at 189-90)   Petitioner said that he "had no other way to go, that the world had fell (sic) in, and he was tired of the abuse." (*Id*. at 190)   Petitioner said, "I'm ready to accept it.  I know what the good book says, and maybe I shouldn't be the one to talk about it after what I have done." (*Id*.)   At 1:59 p.m., Petitioner stated:

> I couldn't take it anymore, I lost it, I lost it bad.  Now I'm ready to pay This isn't me, I know what I did.  I hate to hurt my mom this way.  Don't have to worry about me no more.  I hope I did not sacrifice my life for nothing.  Hope this turns my children's lives around.  My poor mother. The sad thing about the whole thing, while I clicked, is that I didn't know nobody while I was in this stage.  I'm ready, I have no life no more, I have no family no more, I have no reason to live no more.

(Respondents' Exh. A at 191)   Petitioner continued, "I'm sacrificing myself for my children. I hope it wasn't for nothing.  My children and my wife are crying, run around saying why did daddy do that . . . .The most dangerous thing you can do is play with someone's emotions, that it what makes people click, what happens every day to thousands of people all over the world." (*Id*.)

Sergeant Blakeman then went to the detention facility and told Petitioner that the County Attorney wanted his blood drawn to compare it to blood at the crime scene. (Respondents' Exh. A at 99, 192)   Petitioner stated, "The only blood there is is from the people I shot.  There's none of my blood at the crime scene." (*Id*. at 192)

Police found four expended 9mm shell casings and five live 9mm bullets in the courtyard area of the Family Estates complex, and three expended 9mm shell casings and

- 7 -

three expended 9mm bullets inside Janice's apartment.  Police also found two live 9mm rounds in the kitchen of Janice's apartment.  (Respondents' Exh. A at 111, 120-21, 148-68, 174)   All of the shell casings were from the gun Petitioner had borrowed from John C. and had in his possession when confronted by Sergeant Blakeman.  (Respondents' Exh. A at 92-93, 138-39)   The three expended 9mm bullets found inside Janice's apartment were fired from the same gun.  (Respondents' Exh. A at 140-41)   The gun held 15 rounds in the magazine, and another in the chamber.  (*Id*. at 103-104)

A search of Petitioner's car resulted in the seizure of a National Rifle Association certificate, dated May 5, 1982, certifying Petitioner was a "police expert," and a document, dated January 28, 1982, reflecting that Petitioner had completed 400 hours of police officer training at the Arizona Law Enforcement Training Academy.  (Respondents' Exh. A at 113-114, 116-117, 122)

### B.  Charges and Trial

On October 19, 2000, the State of Arizona charged Petitioner with one count of first-degree murder, and two counts of attempted first-degree murder.  (Doc. 1 at 8; Respondent's Exh. D at 84-85)   Petitioner's case proceeded to a jury trial.[3]  Both Betty and T.R. recovered and testified at trial.  (Respondents' Exhs. A, C)   Janice died from her injuries.  (Respondents' Exh. A at 213-15)  On April 9, 2002, a jury convicted Petitioner as charged.  (Respondents' Exh. D at 84-85)   On June 21, 2002, the trial court sentenced Petitioner to aggravated consecutive terms of 18 years' imprisonment on Counts 2 and 3, to be followed by a consecutive term of imprisonment for the remainder of his natural life on Count 1.  (Respondents' Exh. E at 78-79)

### C.  Direct Appeal

Petitioner timely filed a direct appeal, raising one claim: There was insufficient evidence to support his conviction for first-degree murder and one of the attempted murder

---

[3]  The Honorable James H. Keppel presided over Petitioner's trial and post-conviction proceedings.

1  convictions.  (Respondents' Exh. F)   On September 30, 2003, the Arizona Court of Appeals

2  rejected Petitioner's claims and affirmed his convictions and sentences.  (Respondents' Exh.

3  G)

### D.  Post-Conviction Proceeding

5          In the meantime, on July 2, 2002, Petitioner filed a notice and petition for post-

6  conviction relief pursuant to Ariz.R.Crim.P. 32.  (Respondents' Exh. H)   Petitioner was

7  appointed counsel who filed a petition for post-conviction relief.  (Respondents' Exh. I)

8  Petitioner argued that trial counsel was ineffective because he had not had sufficient time to

9  prepare for the case.  (Respondents' Exhs. H, I)   Petitioner claimed that attorney Robin

10  Puchek, who tried the case, had been appointed just before trial and was not sufficiently

11  prepared to proceed.  (Respondents' Exh. I at 3-6)   Petitioner asserted that none of his

12  attorneys had adequately prepared the case for trial and that, if they had "spent some time"

13  with him, they would have learned that he had intended to claim self-defense.  (Respondents'

14  Exh. I at 3-6)   Petitioner also argued that Puchek should have elicited testimony from his

15  brother Robert, who had allegedly been present a few weeks before the shooting, when T.R.

16  had threatened to "blast" Petitioner.  (Respondents' Exh. I at 6)   Petitioner contended that

17  trial counsel had failed to examine Robert adequately to elicit information in support of

18  Petitioner's defense, but rather, only elicited testimony that Petitioner was a "an honest guy."

19  (*Id.*)   Finally, Petitioner asserted a claim of jury misconduct.  (*Id.* at 7-11)   On November 8,

20  2004, the trial court dismissed the petition finding that Petitioner had failed to raise a

21  meritorious claim for relief.  (Respondents' Exh. J)

22          On March 26, 2007, having previously granted Petitioner multiple extensions of

23  time to file a petition for review to the Arizona Court of Appeals, the trial court granted

24  Petitioner's request for leave to file a supplement to the petition for post-conviction relief.

25  (Respondents' Exh. K)   Thereafter, Petitioner filed a supplemental Rule-32 petition,

26  attaching a transcript of a telephonic interview of Petitioner's older brother, Ronnie Gant.

27  (Respondents' Exh. L)   During the interview, Ronnie claimed that he was present during the

28  shooting, and that T.R. had had a gun in his pants and stood up and tried to pull it out before

1   Petitioner started shooting.  (Respondents' Exh. L)   Petitioner asserted that Ronnie would

2   have testified that Petitioner had shot Betty and Janice accidentally while defending himself

3   against T.R.   (*Id*.)

4          On August 21, 2007, the trial court denied Petitioner's supplemental request for

5   post-conviction relief, finding that Petitioner had not raised "a colorable claim upon which

6   relief can be granted and has further failed to demonstrate that he is entitled to a hearing on

7   the issues raised."  (Respondents' Exh. M)

8          On December 21, 2007, Petitioner filed a petition for review in the Arizona Court

9   of Appeals.  (Respondents' Exh. N)   Petitioner argued that: (1) trial counsel rendered

10  ineffective assistance by failing to: (a) adequately cross-examine Robert; (b) present

11  Ronnie's testimony; and (c) adequately prepare for trial; (2) juror misconduct denied his right

12  to a fair and impartial trial; and (3) appellate counsel was ineffective for failing to raise the

13  issue of juror misconduct on direct appeal.  (Respondents' Exh. N)

14         The appellate court denied relief on September 24, 2008.   (Respondents' Exh. O)

15  The court concluded that Petitioner's claim of juror misconduct was precluded by

16  Ariz.R.Crim.P. 32.2 because Petitioner had failed to raise it on direct appeal.  (*Id*. at 3-4)

17  The appellate court declined to consider Petitioner's claim of ineffective assistance of

18  appellate counsel because he had failed to raise it to the trial court in his post-conviction

19  petition and raised it for the first time in his petition for review.  (*Id*. at 4)  The court also

20  rejected Petitioner's claims of ineffective assistance of trial counsel.  The court found that

21  Petitioner's claim regarding the cross-examination of Robert was meritless because Petitioner

22  failed to support his allegations with an affidavit, as required by Ariz.R.Crim.P. 32.5,

23  establishing that Robert had in fact been present when the threat was made and what Robert's

24  testimony would have been at trial.  (Respondents' Exh. O at 5) Thus, Petitioner failed to

25  present a colorable claim and failed to meet his burden of establishing that the trial court had

26  erred in so finding.  (*Id*.)   Moreover, Petitioner had failed to establish that the trial court had

27  abused its discretion in denying relief on Petitioner's claim of ineffective assistance of

28  counsel regarding Ronnie.  (Respondents' Exh. O at 6-9)  The appellate court noted that,

1   contrary to Petitioner' assertion that he had "just discovered the identity of a witness defense

2   counsel should have called," Petitioner asserted in his supplemental Rule-32 petition that

3   "trial counsel [had failed to call Ronnie] despite [Petitioner's] repeated requests to do so."

4   (*Id*. at 6)   Petitioner offered no support for this statement.  (*Id*.)  Further, because Ronnie

5   stated in the interview that he had spoken to trial counsel, it was reasonable to presume that

6   defense counsel made a strategic decision not to present Ronnie as a witness.  (*Id*.)  The

7   appellate court added that this was particularly likely in view of Ronnie's statement that T.R.

8   had been running away from Petitioner when Petitioner shot him, which contradicted

9   Petitioner's claim of self defense.  (Respondents' Exh. O at 7)   Thus, the appellate court

10  concluded that, considering the "strong presumption of effective assistance," the trial court

11  did not err in summarily dismissing Petitioner's claim.  (*Id*. at 8)   Finally, the appellate court

12  concluded that, even assuming defense counsel's performance was deficient, Petitioner could

13  not establish that there was a "reasonable probability that, but for counsel's unprofessional

14  error[,] the result of the proceeding would have been different" because Ronnie's statements

15  contradicted Petitioner's theory of self-defense and "provided little if any exculpatory value

16  with respect to the charges. . . ."  (Respondents' Exh. O at 8-9)

17          Petitioner filed a petition for review in the Arizona Supreme Court which was

18  denied on March 18, 2009.  (Respondents' Exh. P)

19                    **E.  Petition for Writ of Habeas Corpus**

20          On March 1, 2010, Petitioner filed a Petition for Writ of Habeas Corpus in this

21  Court in case number 2:10cv454-MHM (LOA).  (Respondents' Exh. R)  On March 23, 2010,

22  the court dismissed the petition, without prejudice, with leave to amend.  The Court directed

23  the Clerk of Court to dismiss the action if Petitioner failed to file an amended petition with

24  thirty days.  (2:10cv454-MHM (LOA), doc. 7)   On March 25, 2010, Petitioner commenced a

25  new action by filing the Petition for Writ of Habeas Corpus that is currently before the Court,

26  2:10cv676-JWS (LOA).  (Doc. 1)   On April 23, 2010, Petitioner filed an Amended Petition

27  in 2:10cv454-MHM (LOA), that is a duplicate of the Petition in this case.  (2:10cv454-MHM

28

(LOA), doc. 8)   In view of the duplicative filing, the Court dismissed the proceedings in 2:10cv454-MHM (LOA), without prejudice.  (2:10cv454-MHM (LOA), doc. 10).  Respondents refer to March 25, 2010 Petition as an Amended Petition for Writ of Habeas Corpus because the procedural history of this case indicates that the present proceeding is a continuation of the proceeding in 2:10cv454-MHM (LOA).

In his Amended Petition for Writ of Habeas Corpus, Petitioner raises the following claims:

(1) Ground One - Defense counsel was ineffective for failing to (A) adequately prepare for trial; (B) elicit testimony from Robert Gant regarding Petitioner's theory of self defense; and (C) present Ronnie Gant as a witness.

(2) Ground Two - Jury misconduct

(3) Ground Three - appellate counsel was ineffective for failing to raise the jury misconduct issue on direct appeal.

(Doc. 1)

**II. Timeliness under the AEDPA**

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") establishes a one-year period in which to file a petition for writ of habeas corpus in federal court.  28 U.S.C. § 2244(d)(1).

Title 28 U.S.C. § 2244 provides, in pertinent part, that:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.
The limitation period shall run from the latest of-

(A) the date on which the judgment became *final by the conclusion of direct review* or the expiration of the time for seeking such review.

28 U.S.C. § 2244(d) (emphasis added).

To assess the timeliness of the Petition for Writ of Habeas Corpus, the Court must first determine the date on which Petitioner's conviction became "final by the conclusion of direct review."  28 U.S.C. § 2244(d)(1)(A).   Here, following a jury trial, Petitioner was convicted and filed a timely direct appeal.  On September 30, 2003, the Arizona Court of Appeals affirmed Petitioner's convictions and sentences, and the Arizona Supreme Court

denied review on March 22, 2004.  Petitioner did not file a petition for writ of certiorari in the United States Supreme Court.  Accordingly, his conviction became final when the 90-day period for filing a writ of certiorari expired.  *See Bowen v. Roe*, 188 F.3d 1157, 1158-59 (9th Cir. 1999) (stating that period of "direct review" under § 2244(D)(1)(A) includes 90-day period during which petitioner can file petition for writ of certiorari from the United States Supreme Court).  Accordingly, Petitioner's convictions became final on direct review on June 20, 2004.

Petitioner filed a timely notice of Rule-32 review on June 28, 2002.   After considering a supplemental Rule-32 petition, the trial court dismissed the Rule 32 proceeding on August 21, 2007.  Petitioner sought review in the Arizona Court of Appeals which was denied on September 24, 2008.  Thereafter, the Arizona Supreme Court denied review on March 18, 2009.   The limitations period was tolled while Petitioner was pursuing post-conviction relief.  *See* 28 U.S.C. § 2244(d)(2) (the AEDPA's limitations period is tolled during the time that a "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending.").

Thus, the AEDPA limitations period commenced on March 19, 2009, and expired one year later on March 19, 2010.   Here, Petitioner filed his initial Petition for Writ of Habeas Corpus on March 1, 2010.  (Respondents' Exh. R; 2:10cv454-MHM (LOA), doc. 1).  After the Court dismissed that Petition, without prejudice, Petitioner filed the pending Amended Petition for Writ of Habeas Corpus on March 25, 2010.[4]   Respondents argue that Grounds 1(B) and Ground 3 are untimely because they were not included in the timely March 1, 2010 Petition, but were only raised in the Amended Petition for Writ of Habeas Corpus filed on March 25, 2010, after the expiration of the statute of limitations.  (Doc. 12 at 17)

---

[4] Although the petitions were filed in separate case numbers, in view of the procedural history of this case - particularly the Court's decision to permit Petitioner to proceed in this case number while the Court dismissed the previously filed action in which he filed an Amended Petition that is identical to the pending Petition - the Court considers the instant action as a continuation of the previously filed action, 2:10cv454.

1   Petitioner does not address the timeliness issue in his Reply or Supplemental Reply.  (Docs.

2   21, 25)

3            A timely filed petition for writ of habeas corpus does not preserve claims that are

4   not included in the timely petition and which are presented for the first time after the

5   expiration of the statute of limitations.  *Mayle v. Felix*, 545 U.S. 644, 657-664 (2005) (claims

6   not presented in original, timely habeas petition, but only after the one-year limitations period

7   expires, are untimely and not cognizable on habeas corpus review).  Additionally, a timely

8   filed habeas corpus petition does not toll the statute of limitations with respect to claims not

9   included in that petition.  *Duncan v. Walker*, 533 U.S. 167, 181-81 (2001).

10           Federal Rule of Civil Procedure 15(c)(1)[5] provides, in relevant part, that "[a]n

11  amendment pleading relates back to the date of the original pleading when . . .the amendment

12  asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or

13  attempted to be set out - in the original pleading. . . ." Fed R. Civ. P. 15(c)(1)(B).  In *Felix*,

14  the Supreme Court held that in habeas cases, the phrase "conduct, transaction or occurrence"

15  should not be defined so broadly as to allow relation back of a new claim that stems from the

16  petitioner's "trial conviction or sentence." 545 U.S. 644, 656. The Supreme Court reasoned

17  that "[u]nder that comprehensive definition, virtually any new claim introduced in an

18  amended petition will relate back." *Id*. at 656-57.  Instead, the Supreme Court held that

19  "conduct, transaction or occurrence" in federal habeas cases should be defined less broadly,

20  and "allow relation back only when the claims added by amendment arise from the same core

21  facts as the timely filed claims, and not when the new claims depend upon events separate in

22  'both time and type' from the originally raised episodes." *Id*. at 657. Further, the

23  "antecedent" claim to which the petitioner seeks to relate back the later claim must itself not

24  ───────────────

25           [5] The Federal Rules of Civil Procedure apply to habeas corpus proceedings "to the extent
    they are not inconsistent with" the Rules Governing § 2254 cases, Rule 11, and "to the extent
26  that the practice in [habeas] proceedings is not set forth in statutes of the United States."
    Fed.R.Civ.P. 81(a)(2); *Henry v. Lungren*, 164 F.3d 1240, 1241 (9th Cir. 1999).
27

28

be a procedurally defaulted claim.  *King v. Ryan*, 564 F.3d 1133, 1142 (9th Cir. 2009).   The mere fact that the newly raised claims relate to the same trial, conviction, and sentence as the timely filed claim is insufficient to avoid the statute of limitation.  *Felix*, 545 U.S. at 662 (stating that "[i]f claims asserted after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA's limitation period would have slim significance."); *United States v. Pittman*, 209 F.3d 314, 318 (9th Cir. 2000) ("If we were to craft such a rule, it would mean that amendments . . . would almost invariably be allowed even after the statute of limitations had expired, because most [habeas] claims arise from a criminal defendant's underlying conviction and sentence."); *United States v. Duffus*, 174 F.3d 333, 338 (9th Cir. 1999) ("A prisoner should not be able to assert a claim otherwise barred by the statute of limitations merely because he asserted a separate claim within the limitations period.").

In this case, Respondents concede that Petitioner's original petition was timely. Petitioner's Amended Petition, filed on March 25, 2010, was filed after the limitations period expired.  Thus, in order to be considered timely, any new claims in the Amended Petition that were not included in the original petition, must relate back to the claims in the original petition.  *Felix*, 544 U.S. at 653-64.

### A.  Ground 1(B) - ineffective assistance of counsel/Robert Gant

In Ground 1(B) of the Amended Petition, Petitioner argues that trial counsel was ineffective for failing to adequately cross-examine Robert because counsel did not elicit testimony from Robert indicating that "a few weeks prior to the incident, [T.R. threatened] to blast [Petitioner]."   (Doc. 1 at 12)  This claim was not raised in the original, timely Petition and does not relate back to any claim in that Petition.

In his original petition, Petitioner argued that counsel was ineffective for failing to: (1) elicit testimony that Betty had falsely accused Petitioner in the past; (2) adequately prepare for trial; (3) failing to subpoena important witnesses, or get their statements; and (4) failing to elicit testimony on cross-examination that during the 911 call, a witness stated that

1   Janice was having a heart attack.  (Respondents' Exh. R)   Petitioner also challenged the trial

2   court's failure to subpoena Ronnie Gant as a witness.  (Respondents' Exh. R at 9)   Petitioner,

3   however, did not raise a claim related to the cross-examination of Robert Gant.   "'A

4   petitioner does not satisfy the Rule 15 'relation back' standard merely by raising some type of

5   ineffective assistance in the original petition, and then amending the petition to assert another

6   ineffective assistance claim based upon an entirely distinct type of attorney misfeasance.'"

7   *Haithcock v. Veal*, 2009 WL 3157480, *3 (S.D.Cal., Sept. 24, 2009) (quoting *United States v.*

8   *Ciampi*, 419 F.3d 20, 24 (1st Cir.2005); *see also Galaz v. Harrison*, 2007 WL 951352, *21

9   (E.D.Cal., March 27, 2007) (same).  Thus, the Court agrees with Respondents that

10  Petitioner's claim that trial counsel was ineffective for failing to adequately cross examine

11  Robert Gant does not relate back to the original timely petition and, therefore, is untimely.

12  **B.  Ground Three - ineffective assistance of appellate counsel**

13          In Ground Three, Petitioner argues that appellate counsel was ineffective for

14  failing to raise a claim of juror misconduct on direct appeal.  (Doc. 1 at 13)   In the original

15  petition, Petitioner asserted a claim of juror misconduct.  However, he did not argue that

16  appellate counsel was ineffective for failing to raise the juror misconduct issue on direct

17  appeal.  (Respondents' Exh. R at 7)  Respondents assert that the ineffective assistance of

18  counsel claim is not tied to a common core of operative facts and, therefore, is untimely.

19          The Court disagrees.  Although the claim of juror misconduct asserted in the

20  original Petition rests on a different legal basis than Petitioner's claim that appellate counsel

21  was ineffective for failing to raise a claim of juror misconduct on appeal, the resolution of the

22  ineffective assistance claim rests on a common core of operative facts.   A determination of

23  whether counsel's performance was deficient with respect to the juror misconduct issue will

24  necessarily involve a consideration of the facts related to the underlying claim of juror

25  misconduct.  As such, the claim of ineffective assistance of appellate counsel relates back to

26  the original petition.  *See Pratt v. Upstate Corr. Facility*, 413 F.Supp.2d 228, 237 (W.D.N.Y.

27  2006) (failure to raise conflict of interest claim related back to timely conflict of interest

28

claim); *Serrano v. Burge*, 2005 WL 2063765 (S.D.N.Y. 2005) (failure to raise evidentiary and prosecutorial misconduct claims related back to original claims).   As discussed in Section III, *infra*, however, because the  "antecedent" claim to which the petitioner seeks to relate back the claim of ineffective assistance is a procedurally defaulted claim, there is no timely claim to save Petitioner's latter filed claim. *King v. Ryan*, 564 F.3d 1133, 1142 (9th Cir. 2009).

### C.  Equitable Tolling

Because Petitioner's claim of ineffective assistance based on the cross-examination of Robert Gant asserted in Ground One is untimely, the Court will consider whether equitable tolling is appropriate.   Section 2244(d)'s limitations period may be equitably tolled because it is a statute of limitations, not a jurisdictional bar. *Holland v. Florida*, ___ U.S.___, 130 S.Ct. 2549, 2560 (2010); *Waldron-Ramsey v. Pacholke,* 556 F.3d 1008, 1011 n. 2 (9th Cir. 2009).   A petitioner is entitled to equitable tolling only if he establishes two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).   "The diligence required for equitable tolling purposes is  reasonable diligence, not maximum feasible diligence." *Holland*, 130 S.Ct. at 2565 (internal citations and quotations omitted).   Petitioner has not made any showing sufficient to justify equitable tolling in this case.   (Docs. 21, 25)   Accordingly, Petitioner's claim of ineffective assistance based on the cross-examination of Robert Gant asserted in Ground One is untimely.   Moreover, even if this claim were timely, it lacks merit as discussed below.

## III.  Exhaustion and Procedural Bar

Pursuant to 28 U.S.C. § 2254(b)(1), before a federal court may consider a state prisoner's application for a writ of habeas corpus, the prisoner must have exhausted, in state court, every claim raised in his petition. *Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To properly exhaust state remedies, the prisoner must have afforded the state courts the opportunity to rule upon the merits of his federal constitutional claims by "fairly presenting"

1  them to the state courts in a procedurally appropriate manner.  *Castille v. Peoples*, 489 U.S.

2  346, 349 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (stating that "[t]o provide the

3  State with the necessary 'opportunity,' the prisoner must 'fairly present' her claim in each

4  appropriate state court . . . thereby alerting the court to the federal nature of the claim.").

5          It is not enough that all of the facts necessary to support the federal claim were

6  before the state court or that a "somewhat similar" state law claim was raised.  *Reese*, 541

7  U.S. at 28 (stating that a reference to ineffective assistance of counsel does not alert the court

8  to federal nature of the claim).  Rather, the habeas petitioner must cite in state court to the

9  specific constitutional guarantee upon which he bases his claim in federal court.  *Tamalini v.*

10 *Stewart*, 249 F.3d 895, 898 (9th Cir. 2001).  Similarly, general appeals to broad constitutional

11 principles, such as due process, equal protection, and the right to a fair trial, are insufficient

12 to establish fair presentation of a federal constitutional claim.  *Lyons v. Crawford*, 232 F.3d

13 666, 669 (9th Cir. 2000), *amended on other grounds*, 247 F.3d 904 (9th Cir. 2001); *Shumway*

14 *v. Payne*, 223 F.3d 982, 987 (9th Cir. 2000) (insufficient for prisoner to have made "a general

15 appeal to a constitutional guarantee," such as a naked reference to "due process," or to a

16 "constitutional error" or a "fair trial").  Similarly, a mere reference to the "Constitution of the

17 United States" does not preserve a claim.  *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

18 Even if the basis of a federal claim is "self-evident" or if the claim would be decided "on the

19 same considerations" under state or federal law, the petitioner must make the federal nature

20 of the claim "explicit either by citing federal law or the decision of the federal courts . . . ."

21 *Lyons*, 232 F.3d at 668.  A state prisoner does not fairly present a claim to the state court if

22 the court must read beyond the petition or brief filed in that court to discover the federal

23 claim.  *Baldwin*, 541 U.S. at 27.

24          Where a prisoner fails to "fairly present" a claim to the State courts in a

25 procedurally appropriate manner, state court remedies may, nonetheless, be "exhausted."

26 This type of exhaustion is often referred to as "procedural default" or "procedural bar."  *Ylst*

27

28

*v. Nunnemaker*, 501 U.S. 797, 802-05 (1991); *Coleman*, 501 U.S. at 731-32. There are two categories of procedural default.

First, a state court may have applied a procedural bar when the prisoner attempted to raise the claim in state court. *Nunnemaker*, 501 U.S. at 802-05. If the state court also addressed the merits of the underlying federal claim, the "alternative" ruling does not vitiate the independent state procedural bar. *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989); *Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir. 1992) (state supreme court found ineffective assistance of counsel claims "barred under state law," but also discussed and rejected the claims on the merits, *en banc* court held that the "on-the-merits" discussion was an "alternative ruling" and the claims were procedurally defaulted and barred from federal review). A higher court's subsequent summary denial of review affirms the lower court's application of a procedural bar. *Nunnemaker*, 501 U.S. at 803.

Second, the state prisoner may not have presented the claim to the state courts, but pursuant to the state courts' procedural rules, a return to state court would be "futile." *Teague v. Lane*, 489 U.S. 288, 297-99 (1989). Generally, any claim not previously presented to the Arizona courts is procedurally barred from federal review because any attempt to return to state court to properly exhaust a current habeas claim would be "futile." Ariz. R. Crim. P. 32.1, 32.2(a) & (b); *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002); *State v. Mata*, 185 Ariz. 319, 322-27, 916 P.2d 1035, 1048-53 (1996); Ariz. R. Crim. P. 32.1(a)(3) (relief is precluded for claims waived at trial, on appeal, or in any previous collateral proceeding); 32.4(a); Ariz. R. Crim. P. 32.9 (stating that petition for review must be filed within thirty days of trial court's decision). A state post-conviction action is futile where it is time-barred. *Beaty*, 303 F.3d at 987; *Moreno v. Gonzalez*, 116 F.3d 409, 410 (9th Cir. 1997) (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for dismissal of an Arizona petition for post-conviction relief, distinct from preclusion under Rule 32.2(a)).

In either case of procedural default, federal review of the claim is barred absent a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Dretke v. Haley*,

1   541 U.S. 386, 393-94 (2004);  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  To establish

2   cause, a petitioner must establish that some objective factor external to the defense impeded

3   her efforts to comply with the state's procedural rules.  *Id.*  The following objective factors

4   may constitute cause: (1) interference by state officials, (2) a showing that the factual or legal

5   basis for a claim was not reasonably available, or (3) constitutionally ineffective assistance of

6   counsel.  *Id.*  To establish prejudice, a prisoner must demonstrate that the alleged

7   constitutional violation "worked to his actual and substantial disadvantage, infecting his

8   entire trial with error of constitutional dimension."  *United States v. Frady*, 456 U.S. 152, 170

9   (1982).  Where petitioner fails to establish cause, the court need not reach the prejudice

10  prong. To establish a "fundamental miscarriage of justice" resulting in the conviction of one

11  who is actually innocent, a state prisoner must establish that it is more likely than not that no

12  reasonable juror would have found him guilty beyond a reasonable doubt in light of new

13  evidence.  *Schlup v. Delo*, 513 U.S. 298, 327 (1995); 28 U.S.C. § 2254(c)(2)(B).

14                  **Application of Law to Petitioner's Claims**

15              Respondents assert that Petitioner did not properly exhaust Ground Two and that

16  the claim asserted therein is technically exhausted and procedurally barred from federal

17  habeas corpus review.  In Ground Two, Petitioner argues that he was denied a fair trial due to

18  juror misconduct.  (Doc. 1 at 13)  As Respondents argue, Ground Two is technically

19  exhausted but procedurally barred because Petitioner did not fairly present a federal claim of

20  jury misconduct to the state courts, and the Arizona Court of Appeals asserted a procedural

21  bar to consideration of Petitioner's jury misconduct claim.

22              In his petition for post-conviction relief, Petitioner argued that the jury engaged in

23  misconduct that prevented it from being fair and impartial.  (Respondents' Exh. I at 7-10)

24  Petitioner, however, did not refer to federal law in support of his claim.  Rather, he relied on

25  Arizona law.  Accordingly, his federal jury misconduct claim is technically exhausted and

26  procedurally barred, because a return to state court to present that claim would be futile

27  because it be procedurally barred pursuant to Arizona law.  First, Petitioner is time-barred

28

1   under Arizona law from raising this claim in a successive petition for post-conviction relief

2   because the  time for filing a notice of post-conviction relief has long expired. *See*

3   Ariz.R.Crim.P. 32.1 and 32.4 (a petition for post-conviction relief must be filed "within

4   ninety days after the entry of judgment and sentence or within thirty days after the issuance

5   of the order and mandate in the direct appeal, whichever is later.")  Although Rule 32.4 does

6   not bar dilatory claims if they fall within the category of claims specified in Ariz.R.Crim.P

7   32.1(d) through (h), Petitioner has not asserted that any of these exceptions apply to him.

8   Moreover, a state post-conviction action is futile where it is time-barred. *Beaty v. Stewart*,

9   303 F.3d 975, 987 (9th Cir. 2002); *Moreno v. Gonzalez*, 116 F.3d 409, 410 (9th Cir. 1997)

10  (recognizing untimeliness under Ariz. R. Crim. P. 32.4(a) as a basis for dismissal of an

11  Arizona petition for post-conviction relief, distinct from preclusion under Rule 32.2(a)).

12          Furthermore, under Rule 32.2(a) of the Arizona Rules of Criminal Procedure, a

13  defendant is precluded from raising claims that could have been raised on direct appeal or in

14  any previous collateral proceeding. *See Krone v. Hotham*, 181 Ariz. 364, 366, 890 P.2d 1149,

15  1151 (Ariz. 1995) (capital defendant's early petition for post-conviction relief raised limited

16  number of issues and waived other issues that he could have then raised, but did not); *State v.*

17  *Curtis*, 185 Ariz. 112,113, 912 P.2d 1341, 1342 (App. 1995) ("Defendants are precluded

18  from seeking post-conviction relief on grounds that were adjudicated, or could have been

19  raised and adjudicated, in a prior appeal or prior petition for post-conviction relief."); *State v.*

20  *Berryman*, 178 Ariz. 617, 624, 875 P.2d 850, 857 (App. 1994) (defendant's claim that his

21  sentence had been improperly enhanced by prior conviction was precluded by defendant's

22  failure to raise issue on appeal).   The federal jury-misconduct claim asserted in Ground Two

23  could have, and should have, been properly raised on direct appeal or on post-conviction

24  review.  Accordingly, the State court would find that claim procedurally barred.

25          As set forth above, Petitioner's federal claim of jury misconduct asserted in

26  Ground Two is procedurally defaulted and barred from federal habeas review absent a

27  showing of "cause and prejudice" or a "fundamental miscarriage of justice."  Petitioner does

28

1    not assert any basis to overcome the procedural bar.  (Docs. 21, 25)   Accordingly, the Court

2    will not consider the federal claim of jury misconduct asserted in Ground Two.

3            In Ground Three, Petitioner asserts that appellate counsel was ineffective for

4    failing to present a claim of juror misconduct on direct appeal.   (Doc. 1 at 7)  Respondents

5    argue that this claim is procedurally defaulted and barred from federal habeas corpus review

6    for three reasons: (1) Petitioner did not raise this claim in his petition for post-conviction

7    relief; (2) Petitioner did not present the federal nature of this claim in his petition for post-

8    conviction relief; and (3) the Arizona Court of Appeals imposed a procedural bar to avoid

9    reaching the merits of this claim.  (Doc. 12 at 28)

10           In his petition for post-conviction relief, Petitioner did not argue that appellate

11   counsel was ineffective for failing to raise the issue of juror misconduct on direct appeal.

12   (Respondents' Exh. I)   Rather, Petitioner raised that claim for the first time in his petition

13   for review to the Arizona Court of Appeals.  (Respondents' Exhs. N, O at 4)   The appellate

14   court declined to consider this claim pursuant to Arizona Rule of Criminal Procedure 32.9,

15   stating, "[n]or will we address a claim raised for the first time on review such as [Petitioner's]

16   cursory claim of ineffective assistance of appellate counsel."  (Respondents' Exh. O at 4)

17           By virtue of the State court's application of a procedural bar to Petitioner's claim

18   raised in Ground Three, that claim is technically exhausted and procedurally barred.

19   *Nunnemaker*, 501 U.S. at 802-05. Thus, Ground Three is not subject to federal habeas corpus

20   review unless Petitioner establishes cause and prejudice or a fundamental miscarriage of

21   justice.  Proof of cause "ordinarily turn[s] on whether the prisoner can show that some

22   objective factor external to the defense impeded" his compliance with the state rule.  *Dretke*,

23   541 U.S. at 393-94.  In this case, Petitioner does not assert any basis sufficient to overcome

24   the procedural bar.  (Docs. 21, 25)  Petitioner's *pro se* status and ignorance of the law do not

25   satisfy the cause standard. *Hughes v. Idaho State Bd. of Corrections*, 800 F.2d 905, 908 (9th

26   Cir. 1986); *Kibler v. Walters*, 220 F.3d 1151, 1153 (9th Cir. 2000).

27

28

Likewise, Petitioner does not establish that failure to consider his defaulted claim will result in a fundamental miscarriage of justice. (Docs. 21, 25) "[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence." *Calderon* v. *Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup v. Delo*, 513 U.S. 208, 324 (1995). "'To be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Id.* at 559 (1998) (quoting *Schlup*, 513 U.S. at 324). The Supreme Court has explained that:

> The meaning of actual innocence as formulated by *Sawyer* and *Carrier* does not merely require a showing that a reasonable doubt exists in light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, *in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.*

*Schlup*, 513 U.S. at 329 (emphasis added); *see also Lorensten v. Hood*, 223 F.3d 950, 954 (9th Cir. 2000) ("Petitioner bears the burden of proof on this issue by a preponderance of the evidence, and he must show not just that the evidence against him was weak, but that it was so weak that no reasonable juror would have convicted him."). To establish a claim of actual innocence, a petitioner must demonstrate that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence presented in his habeas petition." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998). The "actual innocence" exception is narrow and "claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324. *See also Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002) ("The Supreme Court has stressed the narrow scope of the actual innocence exception . . . .")

Petitioner does not establish that failure to consider Grounds Two and Three will result in a fundamental miscarriage of justice. The Court will consider Petitioner's remaining claim after discussing the standard of review.

1   **IV.  Standard of Review**

2          This Court's consideration of the merits of Petitioner's claims is constrained by

3   the applicable standard of review set forth in 28 U.S.C. § 2254(d), as amended in 1996 by the

4   Antiterrorism and Effective Death Penalty Act ("AEDPA").  The ADEPA "modified a

5   federal habeas court's role in reviewing state prisoner applications in order to prevent federal

6   habeas 'retrials' and to ensure that state-court convictions are given effect to the extent

7   possible under the law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).  The standard in § 2254(d)

8   is "meant to be" "difficult to meet." *Harrington v. Richter*, ___ U.S., ___ , 131 S.Ct. 770, 786

9   (2011).  Section "2254 stops short of imposing a complete bar on federal court relitigation of

10  claims already rejected in state court proceedings."  *Id.* (citations omitted). "Section 2254(d)

11  reflects the view that habeas corpus is a 'guard against extreme malfunction in the state

12  criminal justice systems,' not a substitute for ordinary error correction through appeal."  *Id.*

13  (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979)).

14         Federal habeas relief may not be granted for claims subject to § 2254(d) unless it

15  is shown that the earlier state court's decision "was contrary to" federal law then clearly

16  established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v.*

17  *Taylor*, 529 U.S. 362, 412 (2000); or that it "involved an unreasonable application of" such

18  law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in

19  light of the record before the state court, § 2254(d)(2).  *Richter*, 131 S.Ct. at 785; *see also*

20  *Mancebo v. Adams*, 435 F.3d 977, 978 (9th Cir.  2006).  To determine whether a state court

21  ruling was "contrary to" or involved an "unreasonable application" of federal law, courts

22  look exclusively to the holdings of the Supreme Court which existed at the time of the state

23  court's decision.  *Richter*, 131 S.Ct. at 786 (citing *Renico v. Lett*, 559 U.S. ___ , ___, 130

24  S.Ct. 1855, 1866, 176 L.Ed.2d 678 (2010)).  The Ninth Circuit has acknowledged that it

25  cannot reverse a state court decision merely because that decision conflicts with Ninth Circuit

26  precedent on a federal constitutional issue.  *Brewer v. Hall*, 378 F.3d 952, 957 (9th Cir.

27  2004); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.  2003).  Even if the state court neither

28

explains its ruling nor cites United States Supreme Court authority, the reviewing federal court must nevertheless examine Supreme Court precedent to determine whether the state court reasonably applied federal law.  *Richter*, 131 S.Ct. at 784 (citing *Early v. Packer*, 537 U.S. 3, 8 (2003)).  The Supreme Court held in *Early*, and recently reaffirmed in *Richter*, that citation to federal law is not required and that compliance with the habeas statute "does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *Richter*, 131 S.Ct. at 784.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim', not a component of one, has been adjudicated." *Richter*, 131 S.Ct. at 784.

Under § 2254(d), a state court's decision is "contrary to" federal law if it applies a rule of law "that contradicts the governing law set forth in [Supreme Court] cases or if it confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Mitchell v. Esparza*, 540 U.S 12, 14 (2003) (citations omitted); *Williams*, 529 U.S. at 411.  A state court decision is an "unreasonable application of" federal law if the court identifies the correct legal rule, but unreasonably applies that rule to the facts of a particular case. *Williams*, 529 U.S. at 405; *Brown v. Payton*, 544 U.S. 133, 141 (2005).   An incorrect application of federal law does not satisfy this standard.  *Yarborough v. Alvarado*, 541 U.S. 652, 665-66 (2004) (stating that "[r]elief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable.").  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree on the correctness of the state court's decision.'" *Richter*, 131 S.Ct. 786 (citing *Yarborough*, 541 U.S. at 664).  "'[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in

1   reaching outcomes in case-by-case determination.'" *Richter*, 131 S.Ct. at 786 (citing

2   *Yarborough*, 541 U.S. at 664).

3          The habeas court presumes that the state court's factual determinations are correct

4   and petitioner bears the burden of rebutting this presumption by clear and convincing

5   evidence.  28 U.S.C. § 2254(e)(1) (stating that "a determination of factual issues made by a

6   State court shall be presumed to be correct.  The applicant shall have the burden of rebutting

7   the presumption of correctness by clear and convincing evidence."); *Williams v. Rhoades*,

8   354 F.3d 1101, 1106 (9th Cir. 2004).

9          Where a state court decision is deemed  "contrary to" or an "unreasonable

10  application of" clearly established federal law, the reviewing court must next determine

11  whether it resulted in constitutional error.  *Benn v. Lambert*, 283 F.3d 1040, 1052 n. 6 (9th

12  Cir. 2002).  On habeas review, the court assesses the prejudicial impact of most constitutional

13  errors by determining whether they "had substantial and injurious effect or influence in

14  determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting

15  *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112

16  (2007) (*Brecht* standard applies whether or not the state court recognized the error and

17  reviewed it for harmlessness).  The *Brecht* harmless error analysis also applies to habeas

18  review of a sentencing error.  The test is whether such error had a "substantial and injurious

19  effect" on the sentence.  *Calderon v. Coleman*, 525 U.S. 141, 145-57 (1998) (holding that for

20  habeas relief to be granted based on constitutional error in capital penalty phase, error must

21  have had substantial and injurious effect on the jury's verdict in the penalty phase.);

22  *Hernandez v. LaMarque*, 2006 WL 2411441 (N.D.Cal., Aug. 18, 2006) (finding that even if

23  the evidence of three of petitioner's prior convictions was insufficient, petitioner was not

24  prejudiced by the court's consideration of those convictions because the trial court found four

25  other prior convictions which would have supported petitioner's sentence.)  However, some

26  constitutional errors do not require that the petitioner demonstrate prejudice. *Musladin v.*

27  *Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) (citing *Arizona v. Fulminante*, 499 U.S. 279,

28

1   310 (1991); *United States v. Cronic*, 466 U.S. 648, 659 (1984)). The Court will review

2   Petitioner's claims under the applicable standard of review.

3   **V. Analysis**

4         Petitioner properly exhausted state remedies Ground 1(A), which alleges that trial

5   counsel was ineffective for failing to adequately prepare for trial.  (Doc. 1 at 11)

6         The controlling Supreme Court precedent on claims of ineffective assistance of

7   counsel is *Strickland v. Washington*, 466 U.S. 668 (1984).  Under *Strickland*, a petitioner

8   must show that counsel's performance was objectively deficient and that counsel's deficient

9   performance prejudiced the petitioner. *Id.* at 687; *Hart v. Gomez*, 174 F.3d 1067, 1069 (9th

10  Cir. 1999).  To be deficient, counsel's performance must fall "outside the wide range of

11  professionally competent assistance." *Strickland*, 466 U.S. at 690. When reviewing counsel's

12  performance, the court engages a strong presumption that counsel rendered adequate

13  assistance and exercised reasonable professional judgment. *Id.*  "A fair assessment of

14  attorney performance requires that every effort be made to eliminate the distorting effects of

15  hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate

16  the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689.  Review of

17  counsel's performance is "extremely limited."  *Coleman v. Calderon*, 150 F.3d 1105, 1113

18  (9th Cir. 1998), *rev'd on other grounds*, 525 U.S. 141 (1998).  Acts or omissions that "might

19  be considered sound trial strategy" do not constitute ineffective assistance of counsel.

20  *Strickland*, 466 U.S. at 689.

21        To establish a Sixth Amendment violation, petitioner must also establish that he

22  suffered prejudice as a result of counsel's deficient performance.  *Strickland*, 466 U.S. at

23  691-92.  To show prejudice, petitioner must demonstrate a "reasonable probability that, but

24  for counsel's unprofessional errors, the result of the proceeding would have been different.  A

25  reasonable probability is a probability sufficient to undermine confidence in the outcome."

26  *Id.* at 694; *Hart*, 174 F.3d at 1069; *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998).  The

27  court may proceed directly to the prejudice prong.  *Jackson v. Calderon*, 211 F.3d 1148, 1155

28

1   n. 3 (9th Cir. 2000) (citing *Strickland*, 466 U.S. at 697).  The court, however, may not assume

2   prejudice solely from counsel's allegedly deficient performance.  *Jackson*, 211 F.3d at 1155.

3        In Ground 1(A), Petitioner asserts that trial counsel was ineffective arguing that,

4   because counsel was "formally appointed" on the first day of trial, [he] could not have

5   possibly prepared for trial . . . ."  (*Id.*)   The record reflects that counsel was heavily involved

6   in the case well before the formal appointment.  Trial counsel filed and argued numerous

7   motions beginning on January 22, 2002, over four months before the trial commenced.  These

8   motion included a motion to dismiss, motion for drug testing, motion for evidence

9   examination, motion for deposition, motion to produce, a prior acts motion, motion to

10  suppress Petitioner's statements, a notice of disclosure, a supplemental notice of disclosure,

11  and several motions *in limine*.  (Respondents' Exhs. T-X)   Although trial counsel's formal

12  appointment may have been overlooked until later in the case, the record reflects that he had

13  assumed responsibility for the case months before trial.  Petitioner even notes in his Petition

14  that trial counsel Robin Puchek's name appeared on several minute entries after October

15  2001.  (Doc. 1 at 11)

16        Moreover, the record does not support Petitioner's claim that trial counsel's

17  failure to adequately prepare resulted in his failure to realize that Robert Gant "could have

18  testified that Petitioner shot in self-defense," and in his failure to obtain testimony from

19  Ronnie.  The record reflects that Robert testified at trial.  (Respondents' Exh. A at 235)

20  Petitioner has not presented any evidence describing the additional testimony Robert would

21  have given at trial.  The Arizona Court of Appeals recognized this lack of information, noting

22  that Petitioner has failed to "support his factual allegations with . . . an affidavit from Robert

23  or anyone else establishing that Robert had been present when the threat was made and what

24  Robert would have stated had he been asked about this trial."  (Respondents' Exh. O at 5)

25  Petitioner's claim that trial counsel failed to elicit certain testimony from Robert is

26  speculative, unsupported and insufficient to satisfy *Strickland*.  *See* 466 U.S. at 687-94.

27

28

1      Likewise, Petitioner's claim that trial counsel was ineffective for failing to be

2  aware of Ronnie Gant's testimony and for failing to call him as a witness at trial also fails.

3  The record reflects that, contrary to Petitioner's assertion, counsel was aware of Ronnie's

4  testimony.   On post-conviction review, Petitioner stated that "trial counsel failed to call

5  Ronnie Gant despite [Petitioner's] repeated requests that counsel do so."  (Respondents' Exh.

6  L at 9)   Thus, counsel was aware of Ronnie Gant.  Petitioner further claims that counsel was

7  ineffective for failing to call Ronnie Gant as a witness.  (Doc. 1 at 12)

8      Defense counsel's decision not to call Ronnie Gant is not unreasonable and does

9  not fall below an objective standard of reasonableness under prevailing professional norms.

10  Petitioner fails to demonstrate how his attorney was incompetent or ineffective and does not

11  satisfy his burden of showing that counsel's performance was deficient. *See Toomey v.*

12  *Bunnell*, 898 F.2d 741, 743 (9th Cir.), *cert. denied*, 498 U.S. 960 (1990).  Petitioner does not

13  provide specifics as to what new or exculpatory evidence Ronnie Gant would have offered.

14  Petitioner argues that Ronnie would have testified that T.R. was the aggressor and that

15  Petitioner acted in self-defense.  (Doc. 1 at 12-13)   Contrary to Petitioner's assertion,

16  Ronnie's version of the events did not simply indicate that Petitioner had acted in self-

17  defense.  For example, Ronnie stated that T.R. was running away from Petitioner when

18  Petitioner shot him.  (Respondents' Exh. S at 10-13)   Additionally, Ronnie stated that T.R.

19  never brandished a weapon, and that when Petitioner started to shoot, Ronnie tried to grab

20  him, not to protect him, but because "he was shootin'."  (Respondents' Exh. S at 14)

21  Counsel's decision not to present Ronnie was a witness was a reasonable strategic decision.

22      "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus

23  review because allegations of what the witness would have testified are largely speculative . .

24  . . In addition, for [petitioner] to demonstrate the requisite *Strickland* prejudice, [he] must

25  show not only that [the] testimony would have been favorable, but also that the witness

26  would have testified at trial." *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (citations

27  omitted); *see also United States v. Hardin*, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (rejecting

28

1   claim of ineffective assistance based on counsels' failure to call a witness who would have

2   taken responsibility for a gun found in defendant's possession because, *inter alia*, "[t]here is

3   no evidence in the record which establishes that Washington would testify in [petitioner's]

4   trial.").   Additionally the power to decide questions of trial strategy and tactics rests with

5   counsel and the decision as to what witnesses to call is a tactical, strategic decision.   *Faretta*

6   *v. California*, 422 U.S. 806 (1975).   In determining whether ineffective assistance of counsel

7   occurred, tactical decisions of trial counsel deserve deference when counsel makes an

8   informed decision based on strategic trial considerations and the decision appears reasonable

9   under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).   A trial

10  attorney's strategic decisions do not constitute ineffective assistance simply because in

11  retrospect better tactics are known to have been available. *See Strickland*, 466 U.S. at 689;

12  *see also United States v. Mayo*, 646 F.2d 369, 375 (9th Cir.1981) ("[Petitioner's] allegations

13  amount to nothing more than a difference of opinion with respect to trial tactics. That alone

14  generally does not constitute a denial of effective assistance of counsel").   The ultimate

15  decision not to call witnesses at trial is well within counsel's "full authority to manage the

16  conduct of the trial." *Taylor v. Illinois*, 484 U.S. 400, 418 (1988) ("Putting to one side the

17  exceptional cases in which counsel is ineffective, the client must accept the consequences of

18  the lawyer's decision . . . not to put certain witnesses on the stand. . . . ").

19          The record reflects that counsel's decision not to call Ronnie as a witness was a

20  reasonable strategic choice.  Here, had trial counsel called Ronnie as a witness, his statements

21  that T.R. never pulled out a gun and was shot as he was running away from Petitioner would

22  have undermined Petitioner's theory of self-defense.  Additionally, Ronnie's statement that

23  he tried to grab Petitioner to stop him from shooting would not have supported a theory of

24  self-defense.  Thus, rather than supporting a theory of self-defense, Ronnie's testimony

25  would have detracted from that theory.  Moreover, Ronnie's testimony regarding T.R.'s

26  propensity for violence was not necessary because Petitioner testified at trial that T.R. was

27  know to carry a weapon, and that Petitioner thought T.R. had a gun.  Additionally,

28

1  Petitioner's son testified that T.R. had moved towards Petitioner before the shooting.  Thus,

2  counsel's decision not to call Ronnie as a witness was reasonable trial strategy, and the State

3  court's denial of this claim was not contrary to, or an unreasonable application of, *Strickland*.

4          In summary, Petitioner has not shown that the state court's rejection of his claim

5  of ineffective assistance based on Ronnie's testimony was contrary to, or an unreasonable

6  application of, *Strickland*.

7  **VI.  Conclusion**

8          Based on the foregoing, the Petition should be denied and dismissed with

9  prejudice.

10          Accordingly,

11          **IT IS RECOMMENDED** that Petitioner's Petition for Writ of Habeas Corpus,

12  doc. 1, be **DENIED**.

13          **IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and

14  leave to proceed *in forma pauperis* on appeal be **DENIED** because the dismissal of the

15  Petition is justified by a plain procedural bar and jurists of reason would not find the

16  procedural ruling debatable and because Petitioner has not made a substantial showing of the

17  denial of a constitutional right.

18          This recommendation is not an order that is immediately appealable to the Ninth

19  Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of

20  Appellate Procedure, should not be filed until entry of the District Court's judgment.  The

21  parties shall have (14) fourteen days from the date of service of a copy of this

22  recommendation within which to file specific written objections with the Court.  *See,* 28

23  U.S.C. § 636(b)(1); Rules 72, 6, Federal Rules of Civil Procedure.  Thereafter, the parties

24  have (14) fourteen days within which to file a response to the objections.  Failure timely to

25  file objections to the Magistrate Judge's Report and Recommendation may result in the

26  acceptance of the Report and Recommendation by the District Court without further review.

27  *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  Failure timely to file

28

objections to any factual determinations of the Magistrate Judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See*, Rule 72, Federal Rules of Civil Procedure.

DATED this 23rd day of May, 2011.

Lawrence O. Anderson
United States Magistrate Judge